[No. 1626.]

# THE STATE OF NEVADA, EX REL. GEORGE E. KITZMEYER, RELATOR, v. SAMUEL P. DAVIS, AS STATE CONTROLLER, RESPONDENT.

COURTS—SUITABLE COURT ROOM—POWER TO PROVIDE—STATUTORY AND INHERENT POWERS. 1. The Act of February 8, 1887 (Comp. Laws, 2040–2044), as amended by act of March 11, 1899, creating the board of capitol commissioners, confers upon the board the control of the expenditure of all appropriations for furnishing the capitol building and offices, and for defraying all contingent expenses of all state offices about the building, etc., "unless otherwise provided." Comp. Laws, 2518, originally enacted shortly after the adoption of the state constitution, authorizes the supreme court to bind the state in providing a suitable court room when the state has failed to do so: *Held*, that the court had the power to procure, at the expense of the state, furniture for the court room, where the commissioners had refused to procure the same, Laws 1887, as amended by Laws 1899, not repealing Section 2518.

2. The supreme court possesses the inherent power to procure, at the expense of the state, suitable furniture for its court room.

3. Since Stats. 1901, p. 60, sec. 38, which makes appropriations for the fiscal years 1901 and 1902 for the current and contingent expenses of the supreme court, etc., appropriates money to pay for furniture for the supreme court room, the question of the court's power, notwithstanding Const. art. IV, sec. 19, prohibiting the withdrawal of money from the treasury except in consequence of an appropriation made by law, to order furniture for its court room and require the state to pay therefor, in the absence of an appropriation act, does not arise.

ORIGINAL APPLICATION for writ of *mandamus* by The State, on the relation of George E. Kitzmeyer, against S. P. Davis, State Controller. **Granted.**

The facts sufficiently appear in the opinion.

*Trenmor Coffin*, for Relator:

I. The supreme court under the statutes of this state had authority to make the order referred to, and the purchase price of the chairs must be paid out of the public treasury.

II. It is the duty of the state controller, by virtue of his office, to draw his warrant upon the state treasury for the amount of said bill as allowed by the majority of the state board of examiners.

III. The state controller, in his opinion overruling the supreme court, says: "I. The supreme court has no autho_ity to order furniture for the court room, such authority being alone vested by law in the board of capitol commis-

sioners." The controller refers to the act of February 8, 1887 (Stats. 1887, p. 40.) He doubtless intended to refer to the act amendatory thereof, which supersedes it, found in Comp. Laws, secs. 2040 to 2044. Sections 4 and 5 of the amendatory act are as follows: "2043. SEC. 4. Said board shall have the supervision over and control of the state capitol building, the capitol grounds and water works, the state printing office building and grounds, and all other state buildings, grounds and properties not otherwise provided for by law." "2044. SEC. 5. Said board shall control the expenditure of all appropriations for furnishing, repairing and maintaining said buildings and grounds, offices and property connected therewith; for defraying all contingent expenses of all state and other officers about said building; for transportation of books and documents; storage and transportation of state property, and for salaries of porters, watchmen and laborers about said buildings and property, unless otherwise provided." (Comp. Laws, 1900, secs. 2043, 2044.) The last clause of each of these two sections leaves the supreme court free to act if any statute can be found authorizing it to act when emergency or necessity requires. Section 2518 of the Compiled Laws reads as follows: "The supreme court shall hold its sessions at the capital of the state. If a room in which to hold the court, together with attendants, fuel, lights and stationery, suitable and sufficient for the transaction of business, be not provided by the state, the court may direct the sheriff of the county in which it is held to provide such room, attendants, fuel, lights and stationery, and the expense thereof shall be paid out of the state treasury." This section seems to give clear authority to the supreme court to act in the premises, untrammeled by other statutes.

IV. The ancient Roman tribunal in the basilica adjoining the forum was furnished with seats; the seats were in the form of stone benches (usually marble) fixed and permanent. The seats or benches were a part of the tribunal or room or hall in which justice was administered. The Roman prætor sat upon the "curule chair" in the tribunal. (See *Forum*, *Basilica*, *Tribunal*, and *Prætor*, Ency. Brittanica.) England was a Roman province for about four hundred years.

The Romans introduced their form of tribunal into England. The Roman prætor was the prototype of the English chancellor and judge. The Roman basilica, including its tribunal, was the prototype of all of our modern churches, assembly halls and court rooms. (Guizot's History of England; Green's History of the English People.) We find the following concerning an ancient English chancellor's court in Cunningham's Antiquities of the Inns of Court: "The place where the lord chancellor anciently sat, and held this court, was at the upper end of Westminster Hall, at that long marble table which is there situate (though now covered with the courts there erected) whereunto are five or six steps of ascent; for in 36 E. III, when Simon Langham, bishop of Ely, was made lord chancellor (which was on Sunday, the 19th of February), the record says that on the Tuesday next following, taking the great seal with him to Westminster, *in fede marmorea, ubi cancellarii federe funt affueti, fedens, literas patentes, confignari fecit*, he placed himself in the marble chair wherein the chancellors used to sit and sealed patents, etc. Which marble chair to this day remaineth, being fixed in the wall there, over against the middle of that marble table." (Historical Memorials, Cunningham; Part II, Antiquities of the Inns of Court, p. 87.)

V. The phrase "sitting of court," which is used as synonymous with "term of court" or "session of court," necessarily implies that the court room was always furnished with seats. We doubt if an instance can be found in history of an Anglo-Saxon court "sitting" with its judges and court's officers and counsel and litigants standing. (See Cunningham's Antiquities of the Inns of Court, Part II.)

VI. "The security of human rights and the safety of free institutions require the absolute integrity and freedom of action of courts. * * * Even without statutory enactment, however, the court, as we have seen, possesses all powers necessary for the free and untrammeled exercise of its functions." (*Bd. Comrs. Vigo Co.* v. *James W. Stout*, 22 L. R. A. 398, 136 Ind. 53.)

VII. The court has inherent power to provide for itself, at public expense, whatever is necessary for its comfort, or for the transaction of its business, and the court must neces-

sarily be the judge of what is needed. (*Comrs.* v. *Hall*, 7 Watts (Pa.) 290; *Watson* v. *County*, 53 Mo. 133; *Belvin* v. *City of Richmond*, 85 Va. 574; *Comrs.* v. *Hall*, 7 Ind. 265; *State* v. *Smith*, 5 Mo. App. 427; *McCalmont* v. *County*, 29 Pa. St. 417; *Venango Co.* v. *Durban*; 3 Grant's Cases (Pa.) 66; 93 N. C. 105; 115 Ill. 311; 42 Kan. 223.)

VIII. All appellate tribunals possess certain inherent powers essential to their independence as courts of justice, the orderliness of the proceedings, preservation of their dignity, and efficiency of action." (2 Enc. Pl. & Pr. p. 12, and notes and authorities cited; see also numerous other cases cited in notes, vol. 22 L. R. A. pp. 398-9; also in briefs of counsel on pp. 402-406 of same volume.)

*William Woodburn*, Attorney-General, for Respondent:

I. No matter how just or equitable a claim against the state may be, no duty devolves upon the controller to draw his warrant for the payment thereof until an appropriation be made by law for the purpose. (*Lithograph Co.* v. *Henderson*, 32 Pac. Rep. 417; 18 Colo.; *State* v. *LaGrave*, 23 Nev. 25; *Goodykoontz* v. *Acker*, 19 Colo. 360; *Opinion of the Justices*, 13 Colo. 316; *Henderson* v. *Harvey*, (Kan.) 21 Pac. 177 and *Hubbell* v. *Stover*, Id.; *State* v. *Siebert*, 99 Mo. 122; *Journal Pub. Co.* v. *Kenney*, 9 Mont. 389; *State* v. *Holladay*, 64 Mo. 526.)

II. When an appropriation made for any specific purpose by the legislature has been exhausted, the refusal of the controller to draw his warrant for that specific purpose is right and proper. (*Collins* v. *State*, (So. Dak. 1892) 51 N. W. 776; *State* v. *Babcock*, 18 Nev. 221.)

III. Claims must be allowed by the proper authority before controller is authorized to draw his warrant on treasurer for amount of such claim. (*Ingram* v. *Colgan*, (Cal. 1895) 38 Pac. Rep. 315.)

IV. The power and authority having been vested in the legislature by the constitution to provide by law for meeting the expense of the state government, and the legislature having made provision for meeting these expenses by specific appropriations, the money so appropriated cannot be diverted

from the purpose for which it was appropriated, and expended in a manner other or different than that contemplated by the legislature. Such an interference by or on the part of a coordinate branch of the state government is absolutely unauthorized and unwarranted, and is expressly prohibited by the constitution, art. III, sec. 1: "* * * And no person charged with the exercise of powers properly belonging to one of these departments shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted." (*Burgoyne* v. *San Francisco Suprs.*, 5 Cal. 9; *People* v. *Town of Nevada*, 6 Cal. 143; *Chard* v. *Harrison*, 7 Cal. 113; *People* v. *Sanderson*, 30 Cal. 160; *In re Griffith*, 118 Ind. 83.)

*Per Curiam:*

The relator brings *mandamus* to compel the respondent to draw a warrant upon the contingent fund on account of certain chairs and carpet furnished the supreme court room upon the order of the court.

This court, as a matter of courtesy, having considered and determined of its own motion that the articles named were necessary, directed its clerk to request the board of capitol commissioners to purchase the same. This request was refused, whereupon the court directed its bailiff, the sheriff of this county, to purchase and place in the court room the articles required. In obedience to said order the bailiff purchased the same of the relator. He presented his bill therefor to the board of examiners, a majority of which board approved the same, and upon the presentation of the approved bill to the respondent he demanded a warrant upon the treasurer for the amount therein, which demand was refused.

The respondent does not pretend that the articles furnished by the relator under the order were not necessary; but, as we gather from his answer, bases his refusal to draw the warrant upon two grounds: First, that the order of this court directing its bailiff to purchase is without authority of law, and void, and therefore it did not create a binding liability against the state.

In support of this contention the respondent cites that cer-

tain act creating the board of capitol commissioners, approved February 8, 1887, as amended March 11, 1899. (Comp. Laws, 2040–2044.)

The specific provision of the act relied upon is found in Section 5 of the act, and reads as follows: "Said board shall control the expenditure of all appropriations for furnishing, repairing and maintaining said buildings and grounds, offices and property connected therewith; for defraying all contingent expenses of all state and other offices about said building; for transportation of books and documents; storage and transportation of state property, and for salaries of porters, watchmen and laborers about said buildings and property unless otherwise provided."

Respondent claims that under this section absolute control over the expenditure made by the order of the court is given to this board.

This is an assumption not warranted by the section. The language of the section shows that the legislature never intended to confer such broad and sweeping authority upon the board. If it had any such intention it would never have incorporated into the section the language of the proviso, "unless otherwise provided."

Long before the passage of the act, which is assumed to grant this absolute control to the board, and shortly after the adoption of the constitution, the legislature gave to this court, in express terms (Comp. Laws, 2518), authority to bind the state in providing a suitable room in which to hold its sittings when the state has failed to make such provision—the precise case presented by this record—and, as above stated, it is not pretended that the articles directed to be purchased by the order of the court were not necessary to render the court room suitable for the purposes of the court.

Section 2518 stands as it was originally passed, unmodified and unrepealed.

If the legislature had intended to repeal it by the passage of the act creating the board of capitol commissioners, it would have certainly omitted therefrom the proviso quoted, or would have inserted other language from which such intention could have been inferred.

If the assumption of that absolute control over the pur-

chase of supplies for this court exists in the board of capitol commissioners, under the act creating it, as claimed by the respondent, then has the legislature made, if it has the power so to do, a coordinate and independent branch of the government of this state dependent in the exercise and discharge of its constitutional duties upon the will of a board consisting of members of another department of state government.

Going still further, if such absolute control is given the board as claimed, then would the right of the court to hold its sessions necessary for the administration of the law depend upon the will of the board of capitol commissioners.

If this board has the absolute control, as claimed, then, by refusing to furnish the court room with a stove or other means of heating, could it obstruct the court in its jurisdiction during a greater part of each year. By refusing tables it could prevent the court making records required by law.

To assume that the legislature did confer any such absolute power upon the board is to assume that the legislature possesses unlimited power of legislation in that matter—that it could by hostile legislation destroy the judicial department of the government of this state. In the absence of the statutory authority given to the court by Section 2518, *supra*, there exists, as we believe, the inherent power in the court, growing out of and necessary to the exercise of its constitutional jurisdiction, to make the order.

This doctrine is not new, but has been recognized and acted upon by the courts of other states, and we have been unable to find any authority which holds to the contrary.

In a case decided by the Supreme Court of the State of Indiana, discussing the power of a court to make an order directing the sheriff to take charge of and operate an elevator in the county building for the convenience of the court and litigants, where there were stairways leading to the floor upon which the court room was situated, and where the board of county commissioners having the control of the county building had made an order contrary to the one made by the court, the court say: "Courts are an integral part of the government, and entirely independent, deriving their powers from the constitution, in so far as such powers are not

inherent in the very nature of the judiciary. A court of general jurisdiction, whether named in the constitution or established in pursuance of the provisions of the constitution, cannot be directed or controlled or impeded in its functions by any of the other departments of the government. The security of human rights, and the safety of free institutions, require the absolute integrity and freedom of action of courts. * * * Even without statutory enactment, however, the court, as we have seen, possesses all the powers necessary for the free and untrammeled exercise of its functions." (*Board* v. *Stout*, 136 Ind. 53.)

The same court, in another case, uses the following language: "The power of courts to order necessary repairs to the court room is inherent, and incidental to jurisdiction, like the power to punish for contempt." (*Board* v. *Gwin*, 136 Ind. 562.)

The Supreme Court of the State of Wisconsin, in discussing the power of the superintendent of the capitol building to appoint its janitor under the terms of an act similar in character to the act creating the board of capitol commissioners, *supra*, uses this language: "It is a power inherent in every court of record, and especially one of last resort, to appoint necessary assistants charged with the care of its rooms and other like functions; and the court itself is to judge of the necessity; and it is doubtful whether the court could be deprived of this power by an act of the legislature." (*In re Janitor of Supreme Court*, 35 Wis. 410.) See, also, 22 L. R. A. 398, containing the case of *Board* v. *Stout*, above cited, and the numerous cases cited in the note.

The respondent urges, as a second ground for his refusal, that Section 19, Article IV of our constitution prohibits the withdrawal of money from the treasury but in consequence of an appropriation made by law, and that, there being no appropriation for the purposes named in the order of the court, his refusal is justified.

It is not necessary to discuss the question as to whether under the constitution, in the absence of an act making an appropriation, the respondent is or is not authorized to draw his warrant, as no such question is made by the record.

The legislature did, in 1901 (Stats. 1901, p. 60, sec. 38),

in the general appropriation bill for the fiscal years of 1901 and 1902, make an appropriation for the current expenses, telegraph, postal, and contingent for the state officers and the supreme court, of which sum so appropriated there remains in the treasury an unexpended balance much in excess of the amount of relator's claim.

We do not know of language more appropriate to be used in expressing the intent of the legislature as describing the character of the relator's claim than one of current and contingent expenses. The legislature could not anticipate just what contingencies might arise in the administration of the judicial department and the other departments of state named in the act; and, to meet just such unanticipated contingencies, the appropriation was made. Any attempt of the legislature to forestall the contingent demands by specific items and specific amounts would be absurd, and it therefore wisely set aside by the provision of the act cited a certain sum to meet such necessary contingencies as might arise, that the administration of the government's affairs might not be hampered or impeded for the want of necessary funds.

Let an order be entered granting the peremptory writ, with costs, for the relator.