**UNITED STATES of America, Plaintiff,**

v.

**Alan KAYE, Defendant.**

**No. 83 CR 980.**

United States District Court,
N.D. Illinois, E.D.

May 16, 1984.

Supplemental Opinion May 24, 1984.

Scott Lassar, Ira Raphaelson, Asst. U.S. Attys., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff.

Louis B. Garippo, Susan G. Feibus, Louis B. Garippo, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Alan Kaye ("Kaye") is charged in a nine-count indictment with violating:

1. the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) ("Section 1962(c)") (Count One);

2. the mail fraud statute, 18 U.S.C. § 1341 ("Section 1341") (Count Two);

3. the Hobbs Act, 18 U.S.C. § 1951 ("Section 1951") (Counts Three through Eight); and

4. the Crimes and Criminal Procedure Act of 1968, 18 U.S.C. § 894 ("Section 894") (Count Nine).

Kaye now moves to dismiss all nine counts as legally insufficient. For the reasons stated in this memorandum opinion and order, his motion is granted as to Counts One and Nine, and fractionally as to Count Two, but denied as to all other counts.

### Facts [1]

During 1981 [2] Kaye, a Cook County deputy sheriff, worked one day a month as a part-time Holiday Court bailiff at the Circuit Court of Cook County ("Circuit Court"). During that year Kaye actually solicited and received, or attempted to solicit, money for the asserted purpose of influencing judges in divorce proceedings:

1. actual receipts from Leo Zutler ("Zutler") on April 15, November 12 and November 19 relating to Zutler's pending divorce proceeding;

2. actual receipts from Ronald Elder ("Elder") [3] on December 3 and 10 in connection with Elder's pretended divorce proceedings; and

3. attempted solicitation from Elder in September and October, when Elder's purported divorce proceedings were soon to be filed.

Two other facts are relevant to one or more of the counts:

1. As part of Elder's phony divorce a summons was mailed to an address in Richmond, Virginia, to be served on Elder's "wife."

2. Even though Kaye represented otherwise to Zutler and Elder, government prosecutors have acknowledged they will not attempt to prove at trial that Kaye in fact had any contact with,

made any payment to or attempted to influence, any judge.

### Count One—RICO

Section 1962(c) reads:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Count One alleges Kaye:

1. is associated with an "enterprise" (the Circuit Court) whose activities affected interstate commerce and

2. participated in the conduct of the Circuit Court's activities through a "pattern of racketeering activity" (solicitation and receipt of bribes).

Kaye raises a number of arguments against the legal sufficiency of Count One:

1. Kaye's alleged bribery does not constitute "racketeering activity."

2. Kaye's activities did not have a sufficient impact on interstate commerce.

3. Kaye was not "employed by" or "associated with" the Circuit Court.

4. Kaye did not participate in the Circuit Court's affairs through his acts of bribery.

Each argument will be considered in turn. As will be seen, only Kaye's final contention is ultimately successful.

### 1. Racketeering Activity

For purposes of this case "racketeering activity" is defined in 18 U.S.C. § 1961(1)(A) as:

any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargea-

---

**1.** This statement is drawn from the factual allegations in the indictment and the parties' submissions. It does not of course imply any findings of fact.

**2.** All dates during that year are referred to without any year designation.

**3.** Elder, an undercover FBI agent, used the name "Ronald Johnson" and pretended to be involved in a proposed, and later pending, divorce proceeding.

ble under State law and punishable by imprisonment for more than one year. Count One charges Kaye with violating Ill.Rev.Stat. ch. 38, ¶¶ 33–1(d) and (e),[4] each of which is punishable by imprisonment for more than one year. Ill.Rev.Stat. ch. 38, ¶ 1005–8–1(a)(5).

Kaye argues his alleged activity, because the money was not passed on to any judge, is not the type of bribery encompassed within the phrase "racketeering activity." That contention is without merit.

*United States v. Forsythe,* 560 F.2d 1127, 1137 n. 23 (3d Cir.1977) (quoting *United States v. Dansker,* 537 F.2d 40, 48 (3d Cir.1976)) teaches Congress, in defining racketeering activity, used "bribery" in its generic sense:

> conduct which is intended, at least by the alleged briber, as an assault on the integrity of a public office or an official action.

That generic meaning focuses on the intent of the *briber* to influence official action. See Black's Law Dictionary 173 (5th ed. 1979).

■ All five subsections of Section 33–1 share that common gravamen of the crime of bribery. Subsections (a) through (c) speak of the briber's intent, while subsections (d) and (e) speak of the intent of the person taking the bribe. None of the provisions requires that the official action intended by the briber actually occur or that the public official at whom the bribe is aimed actually receive it. Thus the Illinois statute defines bribery consistently with its generic (and hence its RICO) meaning, and such bribery can constitute racketeering activity for RICO purposes.

### 2. *Impact on Interstate Commerce*

■ Kaye asserts his activities did not have sufficient impact on interstate commerce to subject him to RICO's provisions. But under Section 1962(c) it is the affairs of the *enterprise,* not those of the person charged with violating the section, that must affect interstate commerce. *Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1289 (7th Cir.1983); *United States v. Nerone,* 563 F.2d 836, 852–53 (7th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978). Moreover the effect on interstate commerce need not be caused by the racketeering activity or by the precise type of case involved here (divorce litigation). See *Nerone,* 563 F.2d at 850–51.

At trial the government will have to prove the Circuit Court's effect on interstate commerce. But for purposes of the indictment, it is enough to track the statutory language. *United States v. Roman,* 728 F.2d 846, 850 (7th Cir.1984).

### 3. *"Employed by" or "Associated with" the Enterprise*

Kaye was admittedly not employed by the Circuit Court. Nonetheless the govern-

---

**4.** That section of the Illinois Criminal Code ("Section 33–1") provides in its entirety:

A person commits bribery when:

(a) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or

(b) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to one whom he believes to be a public officer, public employee, juror or witness, any property or personal advantage which a public officer, public employee, juror or witness would not be authorized by law to accept; or

(c) With intent to cause any person to influence the performance of any act related to the employment or function of any public officer, pub-

lic employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or

(d) He receives, retains or agrees to accept any property or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or

(e) He solicits any property or personal advantage which he is not authorized by law to accept pursuant to an understanding that he shall influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness.

(f) Sentence.

Bribery is a Class 2 felony.

ment has urged he was "associated with" that Court in the following ways:

1. Kaye bribed judges (this initially-suggested theory is now abandoned by the government).

2. Kaye is a deputy sheriff whose duty was to attend the Circuit Court.

3. Kaye claimed to be able to influence judges.

■ RICO's concept of "associated with any enterprise" is very broad. See *Schacht v. Brown,* 711 F.2d 1343, 1360 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 508–09, 78 L.Ed.2d 698 (1983); *United States v. Lavin,* 504 F.Supp. 1356, 1359 (N.D.Ill.1981). In Kaye's job as a deputy sheriff, it was his duty to "attend upon" the courts on the days he was assigned as a Holiday Court bailiff and to obey court orders while the Circuit Court was in session. Ill.Rev.Stat. ch. 125, ¶ 19 (and see discussion under Count Two, "Intangible Rights"). All that bespeaks a clear "association with" the Circuit Court.[5]

### 4. *Participation in the Conduct of the Enterprise's Affairs through a Pattern of Racketeering Activity*

■ Kaye argues he did not participate in the conduct of the Circuit Court's affairs *through* his acts of bribery, absent any showing Kaye actually attempted to influence or pay money to a judge. This time Kaye strikes oil.

Courts differ on what must be shown to meet this element of Section 1962(c). Compare *Bennett v. Berg,* 710 F.2d 1361, 1364 (8th Cir.) (en banc), *cert. denied,* —— U.S. ——, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983) (defendant's participation in the operation or management of the enterprise) with *United States v. Cauble,* 706 F.2d 1322, 1332–33 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984) (defendant's use of his position to

commit predicate acts, plus the effects of those acts on the enterprise).

It is useful to translate RICO's statutory language into the facts of this case, aided in part by the insertion of dictionary definitions. In that light the government must prove Kaye took part, directly or indirectly, in the direction or management of the Circuit Court's affairs through his acts of receiving bribes. In those terms *Bennett*'s focus is more faithful to the statutory language than is *Cauble*'s. *Cauble*'s requirement that the predicate act merely have some direct or indirect effect on the enterprise reads all meaning out of the words *"participate . . . in the conduct of* the enterprise's affairs *through* a pattern of racketeering activity." Clearly any showing of Kaye's participation in the direction or management of the Circuit Court (in Congress' language, "in the conduct of [the Court's] affairs") requires a showing he did cause bribes to be passed on to judges.

Invoking *Cauble,* the government argues Kaye's racketeering activity affected the Circuit Court by changing the parties' litigation strategy and creating distrust in the court system. Even under *Cauble*'s test the government's theory is defective: It asserts a hypothetical indirect effect on the litigants, not on the Circuit Court itself. Surely a leap of faith is required to presume the essential next step: that such an indirect effect on the litigants would affect the Circuit Court's handling of the lawsuit. But criminal prosecutions demand faith *and* good works, not faith alone.

Thus the government likely cannot satisfy either reading, and certainly cannot satisfy the preferable *Bennett* reading, of this element of a RICO case. Count One is dismissed.

---

**5.** Kaye relatedly urges the bribery with which he is charged has no relationship to his job, so the government cannot rely on his job to show his association with the Circuit Court enterprise. That contention is without merit. As *United States v. Bledsoe,* 674 F.2d 647, 663 (8th Cir.), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74

L.Ed.2d 608 (1982) points out, a person's association with the enterprise is "distinct from the person's participation in the conduct of the enterprise through a pattern of racketeering activity." Here Kaye's job does show his association with the Circuit Court, separately and apart from his acts of bribery.

### Count Two—Mail Fraud

Section 1341 reads:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Kaye directs three arguments against Count Two:

1. Mailing the divorce summons was not in furtherance of the scheme to defraud.

2. By creating an out-of-state "wife" to whom summons had to be mailed, the government manufactured jurisdiction.

3. Neither as a private citizen nor as a public official could Kaye defraud the public out of its right to honest judges and an honest court system.

Each will be considered in turn.

### 1. Mailing in Furtherance of Scheme to Defraud

█ Under the statute the predicate mailing must be "for the purpose of executing" the scheme to defraud, a concept the cases have defined in terms of the mailings being "incidental to or a normal concomitant of an essential element of that scheme." *United States v. Flick,* 719 F.2d 246, 252 (7th Cir.1983). Here an essential element of Kaye's scheme to defraud Elder was that there be a divorce proceeding to "fix." It was due to Kaye's asserted ability to fix that divorce that the bribe payments were made and the proceeding was filed. Mailing the summons to the putative defendant in the divorce proceeding was a normal part of such proceedings. At least it was certainly reasonable to foresee such use of the mails would occur in connection with the divorce (subject to the problem discussed in the next subsection of this opinion). *United States v. Gorny,* 732 F.2d 597 at 601 (7th Cir.1984). Finally Kaye's stated ability to fix the case "caused" that mailing. Kaye's argument on this score fails.

### 2. Manufactured Jurisdiction

Kaye calls on *United States v. Archer,* 486 F.2d 670 (2d Cir.1973) to contend the government manufactured jurisdiction by creating a "wife" to whom the divorce summons would have to be mailed. *Archer* held the federal agents' placing of interstate telephone calls was not enough to create jurisdiction under the Travel Act, 18 U.S.C. § 1952. In doing so, it eloquently expressed a legitimate concern about the extent to which the government can fairly structure a scenario to bootstrap garden-variety state criminal activity into the ambit of federal prosecutors and federal courts, 486 F.2d at 682:

Our holding is rather that when Congress responded to the Attorney General's request to lend the aid of federal law enforcement to local officials in the prosecution of certain crimes, primarily of local concern, where the participants were engaging in interstate activity, it did not mean to include cases where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present. Manufactured federal jurisdiction is even more offensive in criminal than in civil proceedings, cf. 28 U.S.C. § 1359. As the late Judge Freedman said with respect to civil actions in

*McSparran v. Weist*, 402 F.2d 867, 873 (3d Cir.1968) (en banc), *cert. denied*, 395 U.S. 903, 89 S.Ct. 1739, 23 L.Ed.2d 217 (1969), manufactured jurisdiction "is a reflection on the federal judicial system and brings it into disrepute."

That concern—really a variant on the due process notion of government conduct that passes the line of "fundamental fairness" and becomes "outrageous" [6]—has found its more recent echo in the federal courts' wrestling with Abscam and like examples of what proponents consider creative federal law enforcement and opponents find impermissible. *Archer*'s potential application here is obvious. After all the mine-run Illinois divorce involves spouses who, though they have parted company, are both local residents. Thus the normal means for haling the defendant spouse into court is to place the summons in the hands of the sheriff or a private process server for personal service. No mailing is involved, and if conduct like that ascribed to Kaye is to end up in a criminal court it must be in the state court and not here.

■ But the plot developed by the federal prosecutor and enforcement personnel in this case involved not only a fictitious plaintiff husband and a fictitious defendant wife, but also a fictitious Virginia residence for the latter. That separately manufactured fact created a need for a mailing that would not otherwise exist,[7] and that mailing is what brings Count Two into the present indictment.

■ Unfortunately for Kaye, however, the language quoted from *Archer* was hedged somewhat on denial of rehearing, 486 F.2d at 685–86, and has since been "carefully limited" by the circuit that authorized it. See, *e.g., United States v. Lau*, 714 F.2d 209, 210–11 (2d Cir.1983); *United States v. Giordano*, 693 F.2d 245, 250–51 (2d Cir.1982). Other courts too have been disinclined to apply such equitable notions [8] with a broad brush. See, *e.g., United States v. Jannotti*, 673 F.2d 578, 610–11 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

Although our own Court of Appeals has not had occasion to treat with the problem head-on, its affirmance of this Court in *United States v. Kaminski*, 703 F.2d 1004, 1009–10 (7th Cir.1983) appears to signal denial of Kaye's "manufactured jurisdiction" argument. Even though the entire arson plan in *Kaminski* was staged,[9] the Court of Appeals not only rejected an entrapment defense but found nothing improper in due process terms.

It may be the facts as developed at trial will pose a stronger basis for an *Archer*-type approach. At this point, however, Count Two must survive.

### 3. *Intangible Rights*

Kaye is accused of defrauding the public out of their right to honest judges and an honest court system. As this Court has previously held in *United States v. Freed-*

---

6. See the several opinions in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976).

7. Of course it is otherwise possible for a mailing to be involved in a more usual divorce case. If for example the defendant spouse, though still an Illinois resident, lives outside of Cook County, the plaintiff has the *right* (but is not obliged) to call on the Cook County Sheriff to serve process, Ill.Rev.Stat. ch. 110, ¶ 2–202(b). But if that right is exercised mileage fees outside the county are not taxable as costs, *id.,* and the hypothetical plaintiff might well prefer to have the summons mailed to a local sheriff for service. And of course a mailing needs no interstate component to bring the federal mail fraud statute into play.

8. In a related context the majority opinion in *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973) rejected "giv[ing] the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve."

9. Undercover agents in *Kaminski* chose a Wisconsin rather than an Illinois tavern as the arson target, but that fact alone did not constitute "manufactured jurisdiction" (the criminal statute required that the *building* be *used* in interstate commerce, which would have been true in any event of a tavern—whether in Wisconsin or Illinois—dealing in liquor shipped interstate).

*man,* 568 F.Supp. 450, 452–56 (N.D.Ill. 1983), private citizens without any connections to public officials cannot defraud the public out of such intangible rights. Though Kaye would prefer otherwise, *Freedman* does not cover the present situation because Kaye is not a private citizen—he is a deputy sheriff, a public official.

Under Illinois law the sheriff is a constitutionally established county officer. Ill.Const. art. 7, § 4(c). Deputy sheriffs take the same oath of office and have the same duties as the sheriff. Ill.Rev.Stat. ch. 125, ¶¶ 3, 9, 12. Those duties include attending the court and obeying its orders, *id.* ¶ 19, preventing crime, arresting criminals and keeping the peace, *id.* ¶¶ 17, 82, and the myriad duties that existed at common law, such as maintaining and protecting the dignity of the courts. *Dahnke v. People,* 57 Ill.App. 619, 625 (1st Dist.1894), *aff'd,* 168 Ill. 102, 48 N.E. 137 (1897).

Here Kaye took the bribes in the course of his duty of attending the courts and violated his duties of enforcing the law and maintaining the dignity of the courts, thus depriving the public of its right to an honest court system.[10] See generally *United States v. Keane,* 522 F.2d 534, 549 (7th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). However, it is clear Kaye's violation of his duties could not have deprived the public of its right to honest judges without any showing Kaye attempted to pass the money on to the judges. Thus that part of the indictment must be stricken, but the bulk of Count Two remains.

*Counts Three through Eight—Hobbs Act*

Section 1951 states:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

Kaye challenges Counts Three through Eight in two respects:

1. Those counts have not alleged the requisite nexus to interstate commerce.

2. As to Counts Seven and Eight, Kaye cannot be charged with acting "under color of official right."

Again each argument will be dealt with in turn.

*1. Nexus to Interstate Commerce*

In this circuit the required link to interstate commerce can be established by

---

**10.** Kaye's citation of *United States v. Rabbitt,* 583 F.2d 1014, 1024–26 (8th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979), is unpersuasive. In that case there was no showing of any violation of official duties, as there is here.

showing (1) a business that engages in interstate commerce and (2) wrongful activity that depletes the business assets and thus restricts other potential transactions in interstate commerce. *United States v. Boulahanis*, 677 F.2d 586, 590 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982). That depletion-of-assets theory is not available when the victim is an individual rather than a business. *Id.; United States v. Mattson*, 671 F.2d 1020, 1024–25 (7th Cir.1982).

Although Zutler and Elder [11] assertedly paid the money to Kaye in connection with Zutler's divorce proceedings, the government says it intends to prove that for all practical purposes Zutler the individual equals Zutler the business, bringing the depletion-of-assets theory into play. Kaye retorts that theory is not charged in the indictment and is contrary to law.

■ There is no legal requirement that a particular theory be set forth in the indictment, as long as the indictment charges the essential elements of the crime (including enough facts to protect a defendant's Fifth and Sixth Amendment rights). *Roman*, 728 F.2d at 850. Tested by that standard, the indictment sufficiently alleges the necessary nexus to interstate commerce.

■ Kaye's suggestion that a sole proprietor engaged in interstate commerce cannot provide the requisite link for non-business-related extortion is nonpersuasive, absent an appropriate separation between personal and business funds. *United States v. Freedman*, 562 F.Supp. 1378, 1382 (N.D.Ill.1983). If Zutler *in fact* kept such funds separate, Kaye's contention might have merit. But for present purposes the government claims no such separation exists. That is enough to withstand the current motion to dismiss.[12]

## 2. *Under Color of Official Right*

■ Counts Three through Six charge extortion both by fear and under color of official right, while Counts Seven and Eight charge only the latter. As this Court held in *Freedman*, 562 F.Supp. at 1384–88, private conduct by a private citizen is not "under color of official right."[13] But as already stated in the discussion of Count Two and its "intangible rights" component, Kaye is not a private citizen but a public official.[14]

Kaye's basic premise is that it is unreasonable as a matter of law for a victim to believe that a Holiday Court bailiff, by virtue of his position, could cause the result desired by the extortion victim. But *United States v. Rindone*, 631 F.2d 491, 495 (7th Cir.1980), quoting *United States v. Mazzei*, 521 F.2d 639, 643 (3d Cir.), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975), makes it clear the applicable standard is not the public officials' *actual* ability to perform the act but rather the *victim's* perspective:

> *De jure* ability to perform the promised act need not be present; sufficient is "a reasonable belief that the state system so operated that the power in fact of the defendant's office included the effective authority" to fulfill the promise.

11. No one has explained to this Court how or why payments from *Elder* were aimed at obtaining a favorable result in the *Zutler* divorce. That however is how Count One ¶ 2(b)(3) and (4) read. Counts Seven and Eight are self-contained and do not incorporate Count One's allegations by reference. All the same, both parties' briefs treat the same notion as applying to those two counts.

12. United States Mem. 16–18 identifies two possible added issues as to the interstate commerce component of the offense: (1) the use of FBI funds (Counts Seven and Eight) and (2) the fact of an attempted rather than completed bribe (Count Four). Kaye R.Mem. 30–31 acknowledges those issues are not in dispute.

13. See Appendix.

14. Another originally-advanced government theory as to Kaye's ability to extort under color of official right is that he aided and abetted judges' extortion under color of their own official right (as to which see *Freedman*, 562 F.Supp. at 1384–88). Because the government has now indicated it has no proof of judicial involvement, that theory need not be discussed further.

Kaye reads "power in fact of the defendant's office" too narrowly, as including only his actual ability to do his job-related duties. But that is a misapprehension of the case law. Kaye's job put him on the "inside" of the court system and gave him at least apparent access to the judges.[15] Given the facts that must be assumed as true for the present, it cannot be said as a matter of *law* that a victim could not reasonably believe Kaye's position enabled him to make good on his promise to pass the money on to judges.

Enough has been demonstrated at this point for Kaye to have been acting "under color of official right." Counts Three through Eight survive.

### Count Nine—Extortionate Collection of Extensions of Credit

Section 894 provides in part:

(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

It is preceded by a definitional section (18 U.S.C. § 891, "Section 891") that defines "extortionate extension of credit" (Section 891(6)) in terms of the understanding between the "creditor" (defined in Section 891(2)) and "debtor" (defined in Section 891(3)) at the time credit is extended (defined in Section 891(1)).

Count Nine alleges Kaye threatened violence to collect from Zutler an extension of credit allegedly owed to a judge. Now the government has acknowledged no judicial involvement exists. In an effort to salvage Count Nine, it contends the proof at trial

will show Kaye was attempting to collect an extension of credit owed to *himself.*

*United States v. Kramer,* 711 F.2d 789, 795 (7th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983) teaches when a variance between what is alleged in the indictment and what is proved at trial is fatal:

A variance between allegation and proof is not fatal to a criminal conviction, assuming the proof is of an offense the grand jury intended to charge, unless it affects substantial rights of the accused, Rule 52(a) of the Federal Rules of Criminal Procedure, either by depriving him of an adequate opportunity to prepare a defense or by exposing him to a risk of being prosecuted twice for the same offense.

Usually variance questions do not arise at this stage of the proceedings, but the government's brief has posed the issue squarely. This Court finds the variance between the allegations in Count Nine and the government's expressly anticipated proof at trial is fatal to that Count.

 Count Nine employs an exceedingly odd locution for a loan—an "extension of credit"—by Kaye himself: an "extension of credit" arising from a bribe allegedly owed to a judge. At a minimum that is a bizarre way to describe *Kaye* as the "creditor" with whom Section 891 requires the "debtor" (here Zutler) to have had an "understanding"—at least if Kaye, as the government now concedes, was acting for himself and not for any judge. After all the essence of the government's charge is that Zutler *believed* Kaye was a conduit to a judge, and that is the very antithesis of a contrary "understanding" between Kaye and Zutler, under which Kaye and not the judge was understood by Zutler to be the "creditor."

This Court concludes Count Nine fails both branches of the *Kramer* test.[16] Kaye

---

**15.** For that purpose Kaye need not actually have been assigned to the courtrooms of the judges hearing divorces. "Reasonable belief," as *Rindone* uses the term, can include public cynicism about how the system is sometimes manipulated—a cynicism that certainly preceded, though

it has since been fed by, the Operation Greylord indictments such as this one.

**16.** Indeed there is a serious question whether the government can satisfy even the other part of the *Kramer* standard, which requires "the

has not been sufficiently apprised of the true charge, at least by the terms of the indictment itself, to permit him "an adequate opportunity to prepare a defense." And as now drafted Count Nine does not sufficiently identify the government's real theory of prosecution so as to insulate Kaye from being prosecuted twice for attempting to collect a "debt" owed to himself. Count Nine is dismissed.

#### Miscellaneous Contentions

In his original motion (although not in his reply brief) Kaye launched a general attack on Counts One, Two, Four, Seven and Eight as violating the Ninth and Tenth Amendments. That onslaught asserts the United States' "police power as derived from the Commerce Clause" is exceeded here because of "an instigating, perjuring federal agent" and the consequent " 'make believe' impacts on interstate commerce." Those contentions are without merit. See *United States v. Jarrett*, 705 F.2d 198, 202–03 (7th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984); *Kaminski*, 703 F.2d at 1009–10; see generally *Jannotti*, 673 F.2d 578 (en banc).

#### Conclusion

Kaye's motion is granted as to the dismissal of Counts One and Nine, and as to the striking of the indicated allegation of Count Two. It is denied as to all other counts.

#### Appendix

In an effort to make the worse cause appear the better on the private-citizen "under color of official right" issue, the government cites *United States v. Phillips*, 586 F.Supp. 1118 (N.D.Ill.1984), in which this Court's colleague Judge Aspen construed the Hobbs Act differently than this Court did in *Freedman*, 562 F.Supp. at 1384–88. With all respect, Judge Aspen's analysis is insupportable.

Because the issue need not be redecided here, given Kaye's public-official status, this opinion will not deal with *Phillips* at any length. Three points however may be quickly noted:

1. It is both simplistic and wrong to read "under color" by resort to law-dictionary definitions. That phrase is one with a time honored history and an established meaning under a host of Supreme Court decisions (in the familiar "under color of law" usage of the Civil Rights Act). *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941) (emphasis added) put it in simple and truly classic terms:

> Misuse of power, possessed by virtue of state law and made possible *only because the wrongdoer is clothed with the authority of state law*, is action taken "under color of" state law.

From *Classic* through the southern sheriff's brutal and fatal beating of a black arrestee in *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) until today, the universally recognized meaning of "under color" has *not* been one of false pretense of *nonexistent* power, but rather the wrongful use of rightful and *real* power.

2. Judge Aspen's reference to 18 U.S.C. § 171 (*Phillips*, at 1121) actually cuts the other way from his conclusion. Under both common sense and familiar rules of English, that statute had a *double* application:

> Every officer, clerk, agent or employee of the United States ... who, under color of his office, clerkship, agency or employment....

> [E]very person representing himself to be or assuming to act as such officer, clerk, agent or employee, who, ... under color of his pretended or assumed office, clerkship, agency, or employment....

---

proof [to be] of an offense the grand jury intended to charge." Instead there appears a real likelihood Count Nine may have been presented to the grand jury on the predicate a judge was really involved. This Court need not speculate on that score, given Count Nine's other fatal flaw discussed in the text.

Though this Court shares much of Judge Posner's concern as to the unreasoned use of the canons of statutory construction (see generally Posner, *Statutory Interpretation—in the Classroom and in the Courtroom,* 50 U.Chi.L.Rev. 800 (1983)), another former professor at the same law school, the late William Winslow Crosskey, regularly and sensibly invoked the principle *reddendo singula singulis* in dealing with the use of language like that employed in Section 171. It is thus a distortion to read "pretended or assumed" as an ingredient of "under color"—just the opposite is true. Section 171, like the Civil Rights Act (and like the Hobbs Act), plainly treated "under color" as an attribute of officialdom and not of its simulation.

3. For the reasons stated in *Freedman,* 562 F.Supp. at 1385–86, Judge Aspen's citation to *United States v. Emalfarb,* 484 F.2d 787 (7th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973) as purportedly supporting his reading of the Hobbs Act is incorrect, for it ignores the fact the essence of the offense in *Emalfarb* was the "under fear" rather than the "official" type of extortion.

## SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

On May 16, 1984 this Court issued its memorandum opinion and order (the "Order") dealing with the motion by Alan Kaye ("Kaye") to dismiss each of the nine counts in the indictment as legally insufficient. Now the government has moved for reconsideration of the portion of the Order granting dismissal as to Count Nine. For the reasons briefly stated in this supplement, that motion is denied.

As Order at 19–22 reflects, it appeared from the parties' submissions that Count Nine suffered from a fatal variance between what is alleged in the indictment and what was expected to be proved at trial.[1] In its motion for reconsideration the government asserts (both by way of the motion and by appendices to the motion filed under seal, reflecting transcripts of recorded conversations between Kaye and Leo Zutler) that no variance will in fact exist. According to the government Count Nine "was drafted and presented to the grand jury on the assumption that Kaye was the actual creditor and was lying about the involvement of other people."

Accordingly the government asserts it will in fact prove precisely what was tendered to the grand jury as the predicate for return of indictment Count Nine. In that respect its current Mem. 3 states:

> The government concedes that this is an unusual case brought under 18 U.S.C. § 894 because the defendant is lying about who is the actual creditor.

But what the government fails to recognize is that its present position impales it on the other horn of a dilemma: For the same reason described in Opinion at 21 (in the paragraph beginning "Count Nine employs an exceedingly odd locution...."), the facts the government proposes to prove simply do not charge an offense as defined in 18 U.S.C. § 894 ("Section 894"). That section is not self-contained. As with the familiar patent law doctrine that a patentee may be his own lexicographer, Congress has chosen to set out *its* lexicography for Section 894 in 18 U.S.C. § 891 ("Section 891"). And given that lexicography, the proof the government concedes it will be forced to make actually negates any "understanding" between the "creditor" and the "debtor," so that by definition there can be no "extortionate extension of credit" (Section 891(6)) and hence no crime chargeable under Section 894.

Accordingly the government's motion to reconsider the dismissal of Count Nine is denied. This supplement tracks precisely the analysis of the Order, and it provides

1. That apparent disparity was based on the government's acknowledgement it would not attempt to prove that Kaye in fact had any contact with, made any payment to or attempted to influence, any judge.

the requisite basis to reject Count Nine in light of the government's identification of how that count was presented to the grand jury.